**Patricia FAIR, Petitioner,**

v.

**RED LION INN, operating
as L.P., Respondent.**

No. 95SC753.

Supreme Court of Colorado,
En Banc.

June 30, 1997.

Rehearing Denied Sept. 15, 1997.

432

Jones, Waters, Bennett, Hessel & Cross, L.L.C., Keith Cross, Colorado Springs, for Petitioner.

Holland & Hart, Elaine H. Turner, Colorado Springs, John M. Husband, Denver, for Respondent.

Arckey & Reha, L.L.C., Thomas J. Arckey, Littleton, Jeffrey Menter, Englewood, for Amicus Curiae Plaintiff Employment Lawyers Association.

Holme Roberts & Owen LLP, John R. Webb, Elizabeth M. Flores, Denver, for Amicus Curiae Colorado Association of Commerce and Industry.

Justice SCOTT delivered the Opinion of the Court.

In *Fair v. Red Lion Inn*, 920 P.2d 820 (Colo.App.1995), we granted certiorari to address a single question: whether as a matter of law, the refusal of an employee to accept her former employer's unconditional offer of reinstatement, after a breach of contract by the employer, constitutes a failure to mitigate damages on the part of the employee.[1] Because we conclude that a discharged employee has a duty to mitigate damages by accepting an unconditional offer of reinstatement in the absence of special circumstances, we affirm the judgment of the court of appeals.

The court of appeals upheld the jury verdict finding Red Lion liable for breach of contract. As our order granting certiorari does not address that conclusion, it remains the law of this case and will not be disturbed by our review.

---

1. Our order directed briefing and oral arguments on the following question: "Did the court of appeals err by ruling that, as a matter of law, the refusal of an employee to accept her former employer's offer of re-employment, after a breach of contract by the employer, constitutes a failure to mitigate damages on the part of the employee?"

I.

A.

In June 1987, the respondent, Red Lion Inn (Red Lion), a hotel operator, hired petitioner, Patricia Fair (Fair), as a server in its Colorado Springs restaurant, Maxi's Dining Room. When hired, Fair signed the "Red Lion Inns Employment Agreement Condition of Employment" (Employment Agreement). Among other matters, the Employment Agreement provided that Fair's employment with Red Lion was at will, and that she could be discharged with or without cause. At the same time, Red Lion gave Fair a copy of its employee manual.

The employee manual included a section entitled "Employee Relations Philosophy." In that section, the following language appears:

> The policies, practices and procedures set forth in this Employees' Manual are guidelines for supervision. They are not intended to confer contractual rights of any kind upon any employee or to create contractual obligations of any kind for the Company. The Company may revise, delete or supplement any policy, practice or procedure in this Employees' Manual at any time in its sole discretion.

Also important here, the employee manual set forth certain policies regarding medical leaves of absence: employees were not eligible for a medical leave of absence until after successfully completing a probationary period and working more than three months with Red Lion and, once eligible, an employee was permitted to request a medical leave of absence for a period not to exceed three months. The manual included the following provision:

> During a medical leave of absence, every effort will be made to keep a position available for the employee's return. If it is not possible to keep the position open because of business necessity, preference will be given for a similar position of equal to or lesser pay. Preference will be based upon job openings and qualifications.

. . . .

Failure to advise the company of availability to return to work, failure to return to work upon doctor's release or continued absence from work beyond the time approved by the company will be deemed a voluntary termination of employment with Red Lion Inns.

On April 14, 1990, Fair was injured in a non-work related traffic accident. As a result of injuries from the accident, Fair applied for and was granted a medical leave. The term of her approved leave of absence was from May 25, 1990,[2] to June 20, 1990. At the time of her leave of absence, Fair's position of employment with Red Lion was that of coffee break attendant in the room service department. Her duties included lifting, moving, and setting up a heavy banquet table, as well as walking back and forth from the table to the bar several times a day while carrying trays and coffee urns to refill the urns with coffee kept behind the bar. The injury she sustained in the accident made it difficult for Fair to perform her duties. In addition, on or about May 31, Fair learned that she was pregnant.

On June 20, 1990, the date her medical leave was to expire, Fair asked Neal Gustafson (Gustafson), the director of Human Resources, if she could bring in her doctor's release on June 22. Gustafson told her that was "not a problem." Fair submitted a partial release dated June 22, 1990, which permitted her to return to work, but only under certain conditions. The partial release limited Fair's work activities to those that did not involve heavy lifting (more than fifty pounds), prolonged standing or sitting, or abnormal postures (bending, kneeling, etc.). When told that the conditions of the partial release were not acceptable, Fair asked to be allowed to submit a full release by June 29, 1990, and she was again told that to do so would not be a problem. Shortly thereafter, Fair submitted a full release. The second release, dated June 27, 1990, stated that Fair

---

**2.** According to her testimony, Fair attributes the delay between when she was injured and when she applied for medical leave to an initial lack of discomfort and to pressure from management that she continue working despite her pain.

was "capable of returning to work with no restrictions applied as of July 2, 1990."

In early July 1990, however, Fair learned that her employment with Red Lion had been terminated. The termination notice dated June 20, 1990,[3] set forth the following explanation for her termination:

Patricia's Medical Leave of Absence expired June 20, 1990. Her doctor did not give her a full release until July 2, 1990. The Red Lion is unfortunately unable to hold her position available past the expiration date of June 20, 1990.

On or about July 10, 1990, Fair asked Gustafson whether she was fired or released and he replied that Red Lion could no longer hold the position open.

Believing she was wrongfully discharged, Fair asked her legal counsel, retained due to the accident, to investigate the circumstances of her termination. After requesting and receiving information concerning the termination, Fair's attorney sent Red Lion a letter dated September 17, 1990, stating Fair's position that she had "complied with the Red Lion's policies regarding medical leaves of absence, but that the Red Lion failed to so comply." Citing Fair's "extreme emotional and financial losses as a result of the hotel's actions," her attorney further stated that the purpose of the letter was to "reiterate the facts, as supported by the written documentation, and to see if there is any possibility of reaching some amicable resolution, short of suit." In a September 20 response, Red Lion, through Gustafson, offered Fair "the opportunity to return to her position in Room Service at the Red Lion Hotel, Colorado Springs." The offer (Reinstatement Offer), by its terms, would be held open until October 3, 1990, and if not accepted, would be considered rejected.

Responding to the Reinstatement Offer, by letter dated October 1, Fair's attorney wrote back:

If all of the monetary damages incurred by Ms. Fair as a result of her wrongful termination could be reimbursed to her, she would be willing to accept a position with the hotel. However, due to the apprehension she feels regarding her security in such a position, she would need to have certain special conditions met:

1. She would return to a position at the front desk for the Monday through Friday, 8:00 a.m. to 3:00 p.m. shift.

2. All her employee benefits must be restored without penalty for their interruption.

3. Certain restrictions must be placed on the Red Lion's termination of employment rights.

4. She must be able to transfer to another Red Lion Hotel with the same contract of employment.

On October 9, 1990, Gustafson sent a letter to Fair's attorney clarifying the terms of the Reinstatement Offer. The letter stated in part:

Please be aware that our offer of reinstatement includes restoration of the appropriate benefits with coverage bridged as Ms. Fair would maintain her original hire date.

We have offered to return Ms. Fair to her former position in Room Service as that is the position she is qualified to fill. Your first request to return in a position for which she is not trained and, in essence does not exist due to the hours and days stipulation you have made, cannot be considered.

As an active Red Lion employee, Ms. Fair would have the rights [sic] to transfer based on company policy just as any other employee would. For scheduling purposes, please have Ms. Fair contact me no later than October 15, 1990 or we will consider she has declined our offer of reinstatement and voluntarily resigned her position.

Neither Fair nor her attorney contacted Gustafson before October 15, nor did they otherwise affirmatively respond to the Reinstatement Offer to further clarify, to accept, or to reject the offer.

---

3. Fair argues here, as she did in her successful breach of contract action, that the termination notice was backdated for June 20, 1990, because the decision to terminate her was not made until the month of July.

At trial, Fair testified that she did not accept the Reinstatement Offer because: (1) she believed that she would be terminated again as a form of retaliation; (2) she was concerned about her physical condition due to her pregnancy; and (3) she was uncertain of the meaning of the term "appropriate benefits" in the Reinstatement Offer. Fair did not, however, convey any of her concerns or otherwise discuss the terms of the Reinstatement Offer with her immediate supervisor, or any other person at Red Lion. Instead, by not responding by October 15, Red Lion assumed that Fair "declined" the Reinstatement Offer. Fair did, however, call the insurance company that provided medical benefits for Red Lion employees to ask whether Red Lion had the ability to bridge benefits. An employee of the insurance company told Fair that the determination to bridge benefits did not belong to Red Lion; rather, the insurance company itself made decisions regarding who was covered.

For reasons not reflected in the record, Fair did not share this information with Red Lion. In addition, Fair did not communicate with Red Lion to express any concerns, about her physical condition or otherwise, regarding the Reinstatement Offer.

### B.

On November 13, 1991, Fair commenced this action in the El Paso County District Court by filing her complaint naming Red Lion as the defendant. In the complaint, Fair alleged that Red Lion breached an implied employment contract, among other claims.[4] Through her complaint, Fair essentially asserted that the employment manual and the medical leave of absence form created a valid implied contract of employment that Red Lion failed to honor. The case eventually proceeded to trial.

At trial, Red Lion argued that Fair failed to mitigate her damages by rejecting its offer of reinstatement and, by motion, asked the trial court to direct a verdict and to limit damages. The trial court denied that motion and after the close of evidence, submitted both the questions of liability and damages to the jury. Finding Red Lion liable for breach of contract, the jury awarded Fair $140,000 in actual damages, including damages for loss of salary after Red Lion's offer of reinstatement. The trial court entered final judgment in the amount of $183,414.06, representing the amount of actual damages plus statutory interest of $43,414.06.

Red Lion appealed to the court of appeals. The court of appeals upheld the jury's finding of liability but, concluding that Fair was limited to recovery of damages incurred before Red Lion's unconditional offer of reinstatement, reversed the jury award of damages, and remanded the case for a new trial on damages. See Fair, 920 P.2d at 822–23. Fair filed a petition for certiorari, arguing that the decision of the court of appeals was in error and that Red Lion was not entitled to a directed verdict limiting the amount Fair is entitled to recover under Red Lion's defense that she failed to mitigate her damages. Due to the importance of the questions raised by Fair's petition, we granted certiorari.

### II.

"A motion for directed verdict should not be granted unless the evidence compels the conclusion that reasonable jurors could not disagree and that no evidence or inference has been received at trial upon which a verdict against the moving party could be sustained." Mile Hi Concrete, Inc. v. Matz, 842 P.2d 198, 205 n. 14 (Colo.1992) (citing Smith v. City & County of Denver, 726 P.2d 1125, 1128 (Colo.1986)). If a trial judge concludes that a reasonable jury could return a verdict in the plaintiff's favor, a defendant's directed verdict motion cannot be granted. See Id. The trial judge must view the evidence in a light most favorable to the non-moving party. See Smith, 726 P.2d at 1128; Palmer v. A.H. Robins Co., 684 P.2d 187, 218 (Colo.1984).

However, when viewing the evidence in a light most favorable to the non-moving or

---

4. Fair's other claims were dismissed on Red Lion's motion for summary judgment and as those claims are not before us, they are not relevant under our order granting certiorari and we do not address them here.

opposing party, if the trial court determines the evidence submitted is not in dispute and "compels the conclusion that the minds of reasonable [jurors] could not [render a] verdict against the moving party," a directed verdict may be entered. *McGlasson v. Barger*, 163 Colo. 438, 442, 431 P.2d 778,. 779 (1967) (citing *Nettrour v. J.C. Penney Co.*, 146 Colo. 150, 360 P.2d 964 (1961)). The complex nature of a question usually reserved for the jury militates against a directed verdict. *See id.* at 442, 431 P.2d at 780.

■ It is well established by our precedent that an injured party claiming breach of contract "has the duty to take such steps as are reasonable under the circumstances in order to mitigate or minimize the damages sustained." *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 680 (Colo.1994) (citing *Tull v. Gundersons, Inc.*, 709 P.2d 940, 946 (Colo.1985)); *Technical Computer Servs., Inc. v. Buckley*, 844 P.2d 1249, 1255 (Colo.App.1992). "This means that the plaintiff may not recover damages for injuries which he or she reasonably might have avoided." *Ballow*, 878 P.2d at 680. Mitigation or failure to mitigate is an affirmative defense that may be raised by the defendant and the defendant bears the burden of proving the defense. *See* C.R.C.P. 8(c); *Ballow*, 878 P.2d at 680; *see also Burt v. Beautiful Savior Lutheran Church*, 809 P.2d 1064, 1068 (Colo.App.1990); *Comfort Homes, Inc. v. Peterson*, 37 Colo.App. 516, 519, 549 P.2d 1087, 1090 (1976); CJI–Civ.3d 5:2.

■ The defense of failure to mitigate damages is satisfied when the injured party fails to take reasonable steps to minimize the resulting damages. *See Burt*, 809 P.2d at 1068; *see also Berger v. Security Pac. Info. Sys., Inc.*, 795 P.2d 1380, 1385 (Colo.App. 1990). A plaintiff's failure to mitigate damages is excused, however, if mitigation would require inordinate or unreasonable measures or if there were reasonable grounds for the failure to mitigate. *See Berger*, 795 P.2d at 1385.

■ Generally, the question of what constitutes reasonable effort in mitigation of damages is a question of fact to be determined by the trier of fact. *See Fitzgerald v. Edelen*, 623 P.2d 418, 422 (Colo.App.1980).[5] However, the defense of failure to mitigate damages will not be presented to the jury unless the trial court determines there is sufficient evidence to support it. *See Burt*, 809 P.2d at 1068; *see also Hildyard v. Western Fasteners, Inc.*, 33 Colo.App. 396, 404, 522 P.2d 596, 600 (1974). A trial court's determination will not be disturbed on appeal unless it is clearly erroneous. *See Burt*, 809 P.2d at 1068.

### III.

With our settled law as context, we now address the specific issue and question of first impression before us: whether, as a matter of law, Fair presented sufficient evidence to show that she did mitigate her damages and therefore she should not be prohibited from recovering damages for lost compensation after the date of the Reinstatement Offer.

### A.

The court of appeals reasoned that:

Depending upon the substance of the offer and the circumstances under which it is made, an employee may be required to accept an offer of reemployment from the original employer as part of his or her duty to mitigate damages. A claimant may forfeit all or part of claimed rights to back pay if he or she refuses a job offered by the previous employer that is substantially equivalent to the one from which he

---

5. There is ample support both in the federal courts and our sister jurisdictions for the rule that whether an employee's failure to mitigate is reasonable is a question of fact to be determined by the trier of fact. *See Life Care Ctrs. of America, Inc. v. Charles Town Assocs.*, 79 F.3d 496, 514 (6th Cir.1996); *Frieburg Farm Equip., Inc. v. Van Dale, Inc.*, 978 F.2d 395, 403 (7th Cir.1992); *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 830 (2d Cir.1992); *Ortiz v. Bank of America Nat'l Trust &* *Sav. Ass'n*, 852 F.2d 383, 387 (9th Cir.1987); *O'Donnell v. Georgia Osteopathic Hosp., Inc.*, 748 F.2d 1543, 1551 (11th Cir.1984); *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 517 N.W.2d 19, 27–28 (1994); *Hughes v. Park Place Motor Inn, Inc.*, 180 Mich.App. 213, 446 N.W.2d 885, 889 (1989); *Hawkes v. Norfolk & Western Ry. Co.*, 876 S.W.2d 705, 708 (Mo.Ct.App.1994); *Pacesetter Corp. v. Barrickman*, 885 S.W.2d 256, 263 (Tex. Ct.App.1994).

**438**

'or she was wrongfully terminated so long as acceptance of the reemployment offer would not effect an abandonment of the employee's rights under the original contract.

*Fair*, 920 P.2d at 827 (citations omitted). The court of appeals went on to conclude that if the injured party receives an unconditional offer of reinstatement to the same or a similar position and rejects such unconditional offer in the absence of special circumstances, the ongoing accrual of damages must terminate. *See id.*[6]

■ The court of appeals noted that whether an employee has shown special circumstances which justify a refusal of an unconditional offer to return to employment is generally a question for the trier of fact. *See Fair*, 920 P.2d at 827. The court of appeals then held, however, that when a court, upon consideration of all relevant circumstances,[7] concludes that the proffered reasons for rejecting reinstatement are insufficient as a matter of law, it should direct a verdict for the employer on the issue of damages. *See id.* In other words, "once the employer demonstrates that an unconditional offer of reemployment was made, the burden of going forward shifts to the employee to demonstrate valid reasons for a refusal to accept the offer," *id.*, and if the employee fails to

satisfy such burden, the trial court should direct a verdict limiting the employee's right to damages. The court of appeals relied on *Giandonato v. Sybron Corp.*, 804 F.2d 120 (10th Cir.1986), for this conclusion. In *Giandonato*, the Tenth Circuit held that the trial court erred in denying the employer's motion for a directed verdict because the employee's reasons for rejecting the employer's several reinstatement offers were not sufficient to create an issue for the jury.[8] *See* 804 F.2d at 123.

In determining that the employee's reasons were not valid, the Tenth Circuit applied the "special circumstances" test. *Id.* at 124 ("Under *Ford Motor Co., [v. EEOC,* 458 U.S. 219, 102 S.Ct. 3057 (1982) ], a claimant, absent 'special circumstances,' forfeits his right to backpay 'if he refuses a job substantially equivalent to the one he was denied.' "). Applying that principle to wrongful termination actions, the Tenth Circuit held that "the circumstances surrounding an employer's refusal to accept reinstatement may affect [his] right to additional relief." *Id.*

In other jurisdictions, "special circumstances" have been held to include rejecting reinstatement because to accept would be offensive or degrading, *see Feges v. Perkins Restaurants, Inc.*, 483 N.W.2d 701, 709 (Minn.1992), or because to accept would con-

---

**6.** *See also Smith v. World Ins. Co.*, 38 F.3d 1456, 1464 (8th Cir.1994) (unreasonable rejection of reinstatement offer terminates accrual of back pay damages); *Pierce*, 955 F.2d at 830 (unconditional offer of job substantially similar to the one denied plaintiff may, as a matter of law, toll back pay); *Toledo v. Nobel–Sysco, Inc.*, 892 F.2d 1481, 1493 (10th Cir.1989) (same); *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1203 (7th Cir.1989) (accrual of damages for discriminatory discharge is terminated when employee unreasonably refuses offer of reinstatement); *Giandonato v. Sybron Corp.*, 804 F.2d 120, 124 (10th Cir.1986) (absent special circumstances, a claimant forfeits his right to back pay if he refuses a job substantially equivalent to the one he was denied); *O'Donnell*, 748 F.2d at 1550 (an unreasonably refused offer of reinstatement precludes recovery of both front pay and back pay); *Fiedler v. Indianhead Truck Line, Inc.*, 670 F.2d 806, 808–09 (8th Cir.1982) (same); *McCue v. State of Kansas, Dep't of Human Resources*, 948 F.Supp. 965, 968 (D.Kan.1996) (same); *Cowen v. Standard Brands, Inc.*, 572 F.Supp. 1576, 1581 (N.D.Ala.1983) (same).

**7.** *See Taylor v. Teletype Corp.*, 648 F.2d 1129, 1139 (8th Cir.1981) (trial court must consider all

the circumstances under which the reemployment offer was made and rejected, including the terms of the offer and the reasons for refusal).

**8.** While the issue of reasonableness of the injured party's refusal to accept a reinstatement offer is a question for the jury, there are certain instances where there is insufficient evidence for the issue to reach the jury. If the record is "devoid of the minimal amount of evidence upon which the jury could have reached its verdict," *Feldman v. Philadelphia Hous. Auth.*, 43 F.3d 823, 833 (3d Cir. 1994), or if it is possible to reach only one reasonable conclusion, *see Frieburg Farm Equip., Inc.*, 978 F.2d at 403, then the question of whether an injured person acted reasonably to mitigate damages should not go to the jury. A trial court may conclude that a jury could not find, based on the evidence, that the rejection of the reinstatement offer was reasonable and thereby preclude the jury from deciding the issue. *Cf. World Ins. Co.*, 38 F.3d at 1464 (concluding that a jury could have found that the rejection was reasonable based not on one of the reasons, but on the totality of the circumstances).

stitute a disadvantageous renegotiation of the original contract or an abandonment of rights and remedies thereunder, *see Schwarze v. Solo Cup Co.*, 112 Ill.App.3d 632, 68 Ill.Dec. 228, 232, 445 N.E.2d 872, 876 (1983). Such circumstances, however, do not include a fear of discrimination without evidence that that fear is substantiated, *see Brady v. Nestor*, 398 Mass. 184, 496 N.E.2d 148, 151 (1986), or a feeling that the offer is not bona fide, *see Giandonato*, 804 F.2d at 125.

### B.

■ As discussed above, we have previously recognized the general duty of an injured party to mitigate damages flowing from a breach of contract. Today, we unequivocally hold that the same doctrine shall be applied in circumstances involving employment agreements. Hence, we must now determine whether the evidence in this case regarding the circumstances surrounding Fair's rejection of the Reinstatement Offer was sufficient to create an issue for the jury regarding the reasonableness of Fair's failure to mitigate her damages.

Fair argues that the judgment of the court of appeals should be reversed because it is not supported by the record. Fair contends that the issue of whether her refusal of the Reinstatement Offer was a reasonable failure to mitigate is a question of fact solely for the jury and that the trial court judgment should be upheld on appeal. Because we find that the reasons offered by Fair do not, as a matter of law, constitute "special circumstances" evincing a reasonable basis for re-

jecting Red Lion's offer of reinstatement, we disagree.

■ Moreover, like the court of appeals, we also find support in *Giandonato v. Sybron Corp.*, 804 F.2d 120 (10th Cir.1986).[9] The facts in *Giandonato* are strikingly similar to those here. In determining whether Fair's reasons for rejecting Red Lion's reinstatement offer were valid, we find the reasoning of the Tenth Circuit in *Giandonato* persuasive.[10]

In *Giandonato*, the plaintiff, Nunzio Giandonato, a/k/a John Donato (Donato), worked for Sybron Corporation for over fourteen years as a salesman of process control instrumentation units. 804 F.2d at 120. After a slow year in 1982, Donato's supervisor gave him a choice of continued employment subject to a three-month probation or early retirement with severance pay and extended benefits. *See id.* at 121. Donato decided to resign and also filed an age discrimination complaint with the Equal Employment Opportunity Commission. *See id.* While Sybron denied that any age discrimination had occurred, it made several verbal and written offers to reinstate Donato to his former position on comparable terms; however, Donato rejected every offer. *See id.*

When Sybron argued that its liability for back pay should be limited due to Donato's failure to mitigate by rejecting the offers, Donato asserted three reasons for his rejection of the offers, including that: (1) he did not want to work under his previous supervisor; (2) he had uncertainties about the offers; and (3) his wife was terminally ill with

---

**9.** Although *Giandonato* involved a statutory duty to mitigate and such a statutory duty does not exist here, we still find *Giandonato* compelling because our Colorado precedent recognizes a similar affirmative duty to mitigate or minimize damages.

**10.** In deciding this case, we are not unmindful of the longstanding precedent cited and relied upon by Red Lion. *See Ryan v. Mineral County High Sch. Dist.*, 27 Colo.App. 63, 146 P. 792 (1915). In *Ryan*, the plaintiff received and accepted an offer to serve as principal of a high school. *Id.* at 64–65, 146 P. at 793–94. When the school board voted again and decided to offer the position to another person, it offered the plaintiff an alternative position as grade school superintendent in the same town, for the same time, at the

same salary. *See id.* at 68, 146 P. at 795. The plaintiff rejected the offer because in order to obtain it he would have had to release his claim against the school district for breach of contract based on the principal position. *See id.* Despite the conditional nature of the alternative offer, the court of appeals affirmed the trial court's judgment that the release did not justify refusal on the ground that it would not have been any actual loss to the plaintiff since the salary, term, and locality were the same. *See id.* at 70, 146 P. at 795. Our holding today only permits application of the mitigation defense when accompanied by an *unconditional* offer. To the extent that the holding in *Ryan* differs from our disposition today, we disapprove of the reasoning and result in that case.

cancer. *See id.* at 122. In response, Sybron presented evidence that, not only had it offered to have Donato work under another supervisor, but Donato never asked Sybron to address any of his concerns. *See id.*

Reversing the trial court's denial of Sybron's directed verdict motion, the Tenth Circuit held that Donato's refusal to return to work because his wife was ill and because he did not want to work under his previous supervisor were not valid reasons for refusing the offers of reinstatement. *See id.* at 124. With respect to Donato's uncertainties regarding the offers, the court observed that Donato never requested clarification of the terms of the offers. *See id.* at 125. Relying on *Ford Motor Co. v. EEOC,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982),[11] the Tenth Circuit held that an employee is obligated to minimize his damages by accepting his former employer's offer of reinstatement to a position "substantially equivalent" to his previous job. *See Giandonato,* 804 F.2d at 124.

Here, Fair testified that she rejected the Reinstatement Offer because: (1) she believed that she would be terminated again as a form of retaliation; (2) she was concerned about her physical condition due to her pregnancy; and (3) she was uncertain of the meaning of the terms "appropriate benefits" in the Reinstatement Offer. However, at trial Fair did not produce evidence sufficient to articulate a basis for her belief and concerns based upon the specific terms and conditions of the offer or identifiable conduct of Red Lion or its employees or agents. Thus, without more, the reasons proffered by Fair

are insufficient as a matter of law to create a triable issue for the jury's consideration.

■■■ Fair's first reason—a fear of retaliatory termination after rehire—is not a valid reason for rejecting Red Lion's Reinstatement Offer. Fair testified that she did not accept the Reinstatement Offer because she did not believe that Red Lion had any intention of upholding it. However, Fair did not indicate any basis for such belief, nor did she suggest any conduct by Red Lion or those in its employ which fairly indicates such a predisposition.[12] Moreover, Fair's employment by Red Lion was clearly at will. Red Lion was only required to offer Fair reinstatement to a position of equivalent terms and conditions. Red Lion was not required to offer Fair a position with better terms than she had previously. *See Ford Motor Co.,* 458 U.S. at 232, 234, 102 S.Ct. at 3065–66, 3066–67; *see also Campbell v. Kansas State Univ.,* 780 F.Supp. 755, 766 (D.Kan. 1991) (holding that plaintiff failed to mitigate damages by refusing comparable full-time positions offered by the university). Consequently, since Red Lion's offer was consistent with Fair's previous employment position, her rejection of the offer due to its lack of assurance against future termination was not reasonable.

■■■ In addition, the record fails to suggest and Fair did not specify what, if anything, in the offer or Red Lion's conduct caused her to believe that the offer was anything but a bona fide unconditional offer of reinstatement. *See Saladin v. Turner,* 936 F.Supp. 1571, 1582 (N.D.Okla.1996) (employee gave no proof that the reinstatement

**11.** In *Ford Motor Co.,* the Supreme Court, construing section 706(g) of the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e–5(g), considered whether an employer charged with discrimination in hiring can toll the continuing accrual of back pay liability simply by unconditionally offering the claimant the job previously denied, or whether the employer must offer seniority retroactive to the date of the alleged discrimination. *See* 458 U.S. at 220, 102 S.Ct. at 3059–60. The Court held that a claimant forfeits his right to back pay if he refuses a job substantially equivalent to the one he was denied. *See id.* at 232, 102 S.Ct. at 3065–66. There are no similarly controlling Colorado statutes; however, we find the principles announced in *Ford Motor Co.* persuasive.

**12.** At trial, Fair testified that she considered one of her supervisors, Stefan Harrison, to be a "mentor" and that they worked closely. She also testified that Harrison often inquired about her opinion regarding other employees and encouraged her to move up in the company because she had the qualities for advancement and he was "proud of her." Fair further testified that she received numerous commendations, including employee of the month, and that she "never had any problems with anybody" or any disputes with her supervisor, Ron Barr. In fact, Fair testified that she felt that Robert Deans was a good general manager of Red Lion.

offer, if accepted, would not have been honored by the employer). The evidence indicates that Fair was both competent and efficient in the performance of her duties and that her supervisors valued her service to the company. In fact, during trial, Fair was very complimentary of her supervisors and spoke positively about her relationship with her supervisors and their influence upon her. Thus, her fear that the offer was not bona fide is not supported by the record and therefore does not constitute a reasonable basis for rejection of the Reinstatement Offer.

■ Fair's second reason for rejecting the Reinstatement Offer was that she was concerned about performing the duties of a coffee break attendant during her pregnancy. However, on cross-examination, Fair testified that she had no physical restrictions at the time she refused the Reinstatement Offer. Moreover, Fair failed to communicate any concern regarding physical limitations in her letter requesting special conditions. Certainly, the fact of particular limitations due to her pregnancy would have been relevant information to relay to Red Lion. Fair also neglected to discuss any physical restrictions with anyone at Red Lion. Thus, while we do not exclude physical limitations *per se* as a reasonable basis to reject a reinstatement offer,[13] in this case we are not persuaded that it was sufficiently presented to evince a reasonable basis to reject the Reinstatement Offer.

■ Fair's third reason for rejecting the Reinstatement Offer—that she was concerned about what benefits were in fact included within the term "appropriate benefits"—is also an unreasonable basis for rejecting the offer. First, it is undisputed that Fair never contacted anyone at Red Lion to discuss her concerns or to inquire about the meaning of "appropriate benefits." Instead, Fair, without further inquiry of Red Lion or communication of her concerns, rejected the offer out of hand. Even if Red Lion's medical insurance carrier had declined to continue insurance coverage for Fair, which it did not do, that alone would not be a sufficient basis for rejecting Red Lion's unconditional offer. As the court of appeals noted, the Reinstatement Offer was not contingent. If the carrier did not provide coverage, Fair would be covered because Red Lion would still be bound, even if forced to incur additional expenses for her coverage. At trial, Fair admitted that despite contrary information from Red Lion's insurance carrier, she assumed that Red Lion had the right to bridge benefits and could do so by paying the insurance company directly. Thus, it is clear that Fair's concern about benefits could not stand as a reasonable basis to reject Red Lion's Reinstatement Offer.

Furthermore, the letter containing the Reinstatement Offer represented a written commitment by Red Lion to provide benefits for Fair. Since the letter was offering reinstatement to her former position in Room Service, it would be reasonable to assume that "appropriate benefits" would mean as are normally provided for a person in that position, i.e., the same as what she formerly received. However, even if Fair did not read "appropriate benefits" as the same benefits as she had previously, she could have called her supervisor or Gustafson to determine the meaning of that term and to clear up any confusion on her part.

■ In July, Fair had a full release to return to work stating that she was "capable of returning to work with no [physical] restrictions" whatsoever. Having been so informed by an employee and the employee's physician, it would be unreasonable to require an employer to include within an unconditional offer of reinstatement an accommodation for physical limitations or a change in responsibilities or position of employment solely because the employer is aware the employee is pregnant. Such a result cannot be supported by reason.

The court of appeals concluded that the grounds for refusal presented by Fair do not, as a matter of law, constitute sufficient spe-

---

**13.** The parties have not argued that Red Lion failed to offer reasonable accommodations for Fair in light of her pregnancy. Therefore, we do not reach the question of whether and to what extent the employer has a duty to accommodate a pregnant employee.

cial circumstances that would permit presentation of the mitigation issue to the jury. *See Fair*, 920 P.2d at 828. In her testimony at trial, Fair did not articulate a basis for rejecting Red Lion's offer grounded in the terms and conditions of reinstatement different from her position with Red Lion when discharged, nor one based on Red Lion's conduct or specific incidents or events related to her continuing relationship with Red Lion if she accepted the offer. Because at trial Fair did not present sufficient evidence for the issue of reasonableness of Fair's failure to mitigate to go to the jury, the court of appeals correctly decided that the issue of damages should not have been submitted to the jury without a limiting instruction.

### IV.

■ By our holding today, we do not question the reasonableness of Fair's apprehensions. It goes without saying that an employee who has suffered a wrongful discharge will, as a natural consequence, have the trust and confidence once reposed in an employer diminished by the experience. However, this is true of any party to a contract in which the other party has broken its promise and breached their agreement. The injured party will have apprehensions about future dealings under the contract and, of course, the contract relationship will be affected. Nonetheless, sound principles of contract law in the commercial and employment setting and our precedent, confirmed by our decision in *Ballow v. PHICO Insurance Co.*, 878 P.2d 672 (Colo.1994), ordain the principles we acknowledge today: The injured party claiming breach of an employment agreement has a duty to mitigate or minimize damages. In the employment agreement context, such duty includes the acceptance of an unconditional offer of reinstatement where no special circumstances exist to justify rejection.

■ In sum, we conclude that in the absence of "special circumstances," an employee's rejection of a former employer's unconditional offer of reinstatement constitutes a failure to mitigate damages. The result of such failure to mitigate damages is a loss of any claim to damages based upon the accrual of back pay from the date of the reinstatement offer. Here, we hold that Fair's reasons for rejecting Red Lion's reinstatement offer do not rise to the level of "special circumstances" justifying rejection of the offer. As such, we agree with the court of appeals' conclusion that there was not sufficient evidence on the issue of the reasonableness of Fair's rejection of Red Lion's Reinstatement Offer and that the trial court erred in refusing to limit the damages award.

### V.

Accordingly, we affirm the court of appeals' judgment reversing the award of damages and remanding the case for a new trial on damages only.

MULLARKEY, J., dissents, and HOBBS and BENDER, JJ., join in the dissent.

Justice MULLARKEY dissenting:

I respectfully dissent from the majority's conclusion that Patricia Fair (Fair) failed to present sufficient evidence to allow the jury to determine whether her rejection of Red Lion Inn's (Red Lion) offer of re-employment was reasonable. Despite the majority's assertions to the contrary, its decision in this case fails to correctly apply a "directed verdict" or "judgment notwithstanding the verdict" standard of review which requires us to view the facts, and the inferences that can be legitimately drawn from those facts, in the light most favorable to Fair. Correctly applying that standard, I find that the evidence produced at trial was sufficient to support a verdict by a reasonable jury in Fair's favor.

I also disagree with the majority's interpretation and application of *Giandonato v. Sybron Corp.*, 804 F.2d 120 (10th Cir.1986). The rationale articulated in *Giandonato* that employees are required to request clarification of the terms of ambiguous offers does not mandate the majority's result under the specific facts of this case. Therefore, I dissent.

### I.

While we have recognized the general duty of an injured party to mitigate damages, we

have not before applied this doctrine to employment agreements. *See* maj. op. at 439. We therefore granted certiorari in this case to determine whether an employee's rejection of her former employer's offer of re-employment constitutes a failure to mitigate damages as a matter of law.

The United States Supreme Court has held in the context of Title VII employment discrimination cases that, absent special circumstances, a claimant forfeits her right to back pay if she refuses an offer of employment that is substantially equivalent to the one she was denied. *See Ford Motor Co. v. EEOC,* 458 U.S. 219, 238–39, 102 S.Ct. 3057, 3069–70, 73 L.Ed.2d 721 (1982). An offer for employment is considered substantially equivalent if it affords "virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the ... claimant [was] terminated." *Sellers v. Delgado Community College,* 839 F.2d 1132, 1138 (5th Cir.1988).

As the majority notes, many federal circuits have held that, in cases where the former employer offers a terminated employee re-employment, a reasonable rejection of an offer for re-employment is considered a special circumstance under *Ford. See Smith v. World Ins. Co.,* 38 F.3d 1456, 1464 (8th Cir.1994); *Toledo v. Nobel–Sysco, Inc.,* 892 F.2d 1481, 1493 (10th Cir.1989); *Graefenhain v. Pabst Brewing Co.,* 870 F.2d 1198, 1203 (7th Cir.1989); *O'Donnell v. Georgia Osteopathic Hosp., Inc.,* 748 F.2d 1543, 1550 (11th Cir.1984). Thus, an employee who rejects an unconditional offer for re-employment by her former employer is not precluded from receiving an award for lost back pay compensation after the time of the offer for reinstatement if her rejection was reasonable.[14]

At trial, Red Lion argued in motions for a directed verdict and for judgment notwithstanding the verdict that Fair was not entitled to back wages as a matter of law because she rejected Red Lion's unconditional offer of re-employment. The trial court denied Red Lion's motions and, consistent with

*Ford* and its progeny, instructed the jury that Fair had "the duty to take such reasonable steps as are reasonable under the circumstances to mitigate or minimize ... damages." The jury was also instructed that Fair was precluded from recovering damages for back pay and benefits after the time Red Lion offered her reinstatement if Red Lion proved by a preponderance of the evidence:

1. That it made an offer to reinstate Ms. Fair to her former position or to a position comparable in pay, benefits, and responsibilities; and

2. That Ms. Fair unreasonably rejected the reinstatement offer.

After considering the evidence, the jury rejected Red Lion's affirmative defense and awarded Fair full damages for back pay and benefits.

Red Lion now renews its argument that Fair's rejection of the offer for re-employment was unreasonable as a matter of law. Therefore this court must apply the same standard of review utilized by the trial court on a motion for a directed verdict or a judgment notwithstanding the verdict. Under that standard, we must view the evidence in the light most favorable to the non-moving party, i.e. Fair, and must draw every reasonable inference which can legitimately be drawn from the evidence in favor of that party. *See Nelson v. Hammon,* 802 P.2d 452, 454 (Colo.1990). A judgment as a matter of law for Red Lion is appropriate only if the evidence, and the legitimate inferences drawn from the evidence, viewed in the light most favorable to Fair, would not support a verdict by a reasonable jury that Fair's rejection of Red Lion's offer for re-employment was reasonable. *See id.* In my view, the majority decision incorrectly applies this standard in concluding that this case should not have been submitted to the jury and Fair's rejection of Red Lion's offer for reinstatement was unreasonable as a matter of law.

---

**14.** This court did not grant certiorari on the issue of whether Red Lion's offer was unconditional. The majority assumes for purposes of its opinion,

without deciding, that the offer *was* unconditional. I make the same assumption.

## II.

The majority acknowledges the following three reasons asserted by Fair for her rejection of the reinstatement offer: "(1) she believed that she would be terminated again as a form of retaliation; (2) she was concerned about her physical condition due to her pregnancy; and (3) she was uncertain of the meaning of the terms 'appropriate benefits' in the Reinstatement Offer." Maj. op. at 440. However, because the majority incorrectly finds that "Fair did not produce evidence sufficient to articulate a basis for her belief and concerns based upon the specific terms and conditions of the offer or identifiable conduct of Red Lion," it concludes that "the reasons proffered by Fair are insufficient as a matter of law to create a triable issue for the jury's consideration." *Id.* Based on my reading of the record, I do not agree. Applying the appropriate standard for a judgment notwithstanding the verdict, Fair's second and third reasons for rejecting Red Lion's reinstatement offer clearly present issues of fact for the jury regarding the reasonableness of her rejection.

## A.

The evidence adduced at trial shows that Neil Gustafson (Gustafson), the Director of Human Resources, and Ron Barr (Barr), Fair's immediate supervisor, knew that Fair was pregnant before they told her that she was terminated. Fair testified that she informed them of this fact between the time she gave Red Lion her initial restricted medical release and the time she supplied her full medical release. In asking for an extension to June 27 for filing a full release, she told Barr that if her obstetrician, Dr. Walker, allowed it, her regular physician, Dr. Hart, would be able to give her a full release. She personally took Dr. Hart's release, which stated that she could return to work on July 2, to Gustafson on June 27 and asked him if he needed a release from Dr. Walker as well. Gustafson responded that he did not need a release from her obstetrician and that he would confer with Barr about her return and get back to her. After July 2 came and went without her hearing from Barr or Gustafson, Fair made several calls to Barr, who re-peatedly indicated that he was trying to meet with Gustafson. Finally, on July 9, Fair called Barr again and was told that she had been terminated. Barr told her to speak to Gustafson about the termination.

Fair went to Dr. Walker on July 10 to obtain a release because she was concerned that Barr and Gustafson had not considered her release to be full without information from the obstetrician. After obtaining the release, she took it to Gustafson later that same day. In that meeting Gustafson told Fair that she had been released because Red Lion could no longer hold her position open. However, Gustafson took both releases from Dr. Walker and Dr. Hart and indicated that he would talk to some people about her employment. The release from the obstetrician, Dr. Walker, dated July 10, 1990, was admitted into evidence at trial. Thus, the record shows that Red Lion knew that Fair was three months pregnant when it terminated her. Drawing all inferences in Fair's favor, we must assume that Red Lion knew she was five to six months pregnant at the time it made the reinstatement offer in September.

The majority states that "on cross-examination, Fair testified that she had no physical restrictions at the time she refused the Reinstatement Offer." *Id.* at ——. The majority appears to draw this conclusion from the following testimony:

Q: There is no comment in [the letter requesting conditions of re-employment] that you are not able to perform any particular job function, is there?

A: There wasn't a problem.

Q: And there is no comment in that letter that you are not—that you have any physical restrictions, is there?

A: I had no physical restrictions at that time.

Q: And that would have been on October 1, 1990, correct?

A: Other than my pregnancy.

Q: Okay, but you were physically able to perform your job?

A: I was able to go back to work.

Q: And my question is, there was no reason physically that you were unable to work, true?

A: No, there was not.

Q: Okay. Is that a true statement?

A: True. Under those provisions I could go back to work.

Viewing the testimony in the light most favorable to Fair and drawing all reasonable inferences in her favor, the evidence shows that she had no physical restrictions at that time "other than her pregnancy" and that she could go back to work under the provisions of the request for re-employment she made to Red Lion. In addition, Gustafson testified on cross-examination that he would have a concern about someone six to seven months pregnant lifting a very large coffee table. Thus, contrary to the majority's conclusion, the evidence demonstrates that Fair's pregnancy was a condition affecting her employment of which Red Lion was aware at the time it made the reinstatement offer.

The majority also emphasizes that "Fair failed to communicate any concern regarding physical limitations in her letter requesting special conditions." *Id.* However, as the evidence discussed above shows, she had every reason to believe that Red Lion was fully aware of her pregnancy. The majority concludes, nonetheless, that "while we do not exclude physical limitations *per se* as a reasonable basis to reject a reinstatement offer, in this case we are not persuaded that it was sufficiently presented to evince a reasonable basis to reject the Reinstatement Offer." *Id.*

In essence, the majority holds that any rejection of a reinstatement offer is *per se* unreasonable if an employee does not directly and explicitly communicate her reasons for rejection at the time the offer of reinstatement is made. In this case, Fair informed Red Lion of her pregnancy three months before the reinstatement offer was made. In addition, although she did not specifically mention her pregnancy at the time of the offer, she did respond to Red Lion's initial reinstatement offer with a specific request that certain conditions be met to accommodate her pregnancy.

Drawing all inferences in her favor, a reasonable juror could find that Fair's concern regarding her pregnancy was a reasonable basis for rejecting the offer. I disagree with the majority's conclusion in this case that she did not meet her burden. In addition, as I discuss in part III below, I cannot join in the majority's decision, which holds, in effect, that an employee must always present her reasons for rejection to the employer at the time the reinstatement offer is made. This result unjustifiably prevents the trier of fact from considering all of the facts and circumstances relevant to the determination of the reasonableness of the employee's rejection.

### B.

The majority also improperly applies the standard for a judgment notwithstanding the verdict to Fair's third and final stated reason for rejection. In contrast to the majority's conclusion, my review of the evidence shows that Fair did not "without further inquiry of Red Lion or communication of her concerns, reject[ ] the offer out of hand." Maj. op. at ——. The record establishes that Fair was extremely concerned about medical benefits coverage due to her pregnancy, and that Red Lion was aware that she was pregnant.[15] Red Lion made an admittedly vague initial offer of reinstatement in a September 20, 1990, letter, stating that "we offer Ms. Fair the opportunity to return to her position in Room Service at the Red Lion Hotel, Colorado Springs."[16] In response to that offer,

---

**15.** I note that Fair's concern about medical coverage seems entirely reasonable in hindsight given that Fair gave birth to a child with severe medical complications, including a heart murmur requiring surgery and an eventual liver transplant which has resulted in long-term medical care and frequent hospitalization for the child.

**16.** On direct examination, Gustafson testified to the following:

A: [reading the second paragraph of Fair's letter responding to Red Lion's initial offer on September 20] "Two. All her employee benefits must be restored without penalty for their interruption."

Q: What is different from what you have offered previously when you offered to reinstate her employment? Were you specific in the first letter?

A: No, we were not, but, again, if we were going to reinstate someone, that would go along with it.

Fair made specific requests for her reinstatement which included the explicit condition that "*all* her employee benefits must be restored without penalty for their interruption." (Emphasis added.). In Red Lion's letter in response to Fair's concerns, however, Red Lion stated only that its offer included "restoration of the *appropriate* benefits with coverage bridged as [she] would maintain her original hire date." (Emphasis added.).

Because she was worried about the meaning of "appropriate," Fair took the affirmative step of calling the insurance company directly to determine if Red Lion could honor its offer. She was informed that the insurance company, not Red Lion, had the ultimate authority to determine who was covered. There is no indication that this information was incorrect, i.e. that the insurance company would be the final decision-maker as to whether Fair was covered. Red Lion apparently had not contacted its insurance company about re-employing Fair and the insurability questions raised by Fair's intervening pregnancy and the fact that she had had to enroll in Medicaid for health care coverage after she was fired. Gustafson testified that he did not check with the insurance company himself about coverage until one week after his deposition and two weeks before trial. Moreover, Gustafson testified that he did not know that under the HMO plan offered by Red Lion's insurance company, continuation of coverage was not available for someone on Medicaid. In fact, viewing the testimony and drawing inferences in favor of Fair, none of Red Lion's witnesses knew at the time the reinstatement offer was made whether or not the insurance company would bridge benefits for Fair.

Thus, the facts show: that Red Lion's initial offer was vague; that Fair responded with specific requests, including asking for "all benefits" to be bridged; that Red Lion did not offer her "all" benefits in response but proposed "appropriate" benefits instead; that Fair took the affirmative step of calling

the insurance company and was told that Red Lion did not have the authority to guarantee insurance coverage; and that Red Lion did not know at the time of the offer if the insurance company would bridge her benefits. These facts are sufficient to create a triable issue for the jury as to whether Fair's reason for rejection of the offer was reasonable.

In the end, however, the majority finds that, even if the insurance company would not have bridged Fair's benefits, her concern about insurance was not reasonable as a matter of law, because "[i]f the carrier did not provide coverage, Fair would be covered because Red Lion would still be bound, even if forced to incur additional expenses for her coverage." *Id.* In support of its rationale, the majority highlights Fair's testimony at trial that she assumed Red Lion could bridge coverage if Red Lion was willing to pay for it. However, whether Fair might have believed that Red Lion *could* have bridged her benefits if it paid is distinguishable from her concern as to whether Red Lion, in fact, *would* have done so.

For purposes of argument, I will assume that the majority is correct that Red Lion would have had to bear any and all costs necessary to provide insurance coverage for Fair and her child, although the correctness of the majority's proposition seems highly questionable. The majority's conclusion, however, relies on the assumption that Fair, a five-dollar-per-hour hotel service worker who was forced to go on Medicaid after she was terminated from her job, could not have been reasonably concerned about her health insurance coverage. The majority believes Fair should have known that the statement made by Red Lion in its second reinstatement offer would be legally binding upon it and should have trusted Red Lion despite information she had received from the insurance company that Red Lion's policy might not cover her. In my view, the majority's assumptions are entirely unrealistic and require a level of legal knowledge and sophistication which exceeds that of many lawyers.

Thus, Gustafson acknowledged that Red Lion's first reinstatement offer was not specific or detailed.

Furthermore, Red Lion's use of the word "appropriate" benefits in response to Fair's request for "all" benefits still raises a question as to exactly what benefits Red Lion would have been legally obligated to provide. In my opinion, a reasonable person in Fair's position would not have known what medical benefits Red Lion intended to provide to her and would have been unwilling to surrender her Medicaid coverage on the hope that Red Lion would pick up full coverage. Therefore, I disagree with the majority that a reasonable juror could not find that Fair's concern about insurance coverage was a reasonable basis for rejecting Red Lion's offer.

### III.

As noted above, the majority appears to hold that any rejection of a reinstatement offer is *per se* unreasonable if an employee does not directly and explicitly communicate her reasons for rejection at the time the offer of reinstatement is made. In reaching this result, the majority relies heavily on the reasoning of *Giandonato v. Sybron Corp.*, 804 F.2d 120 (10th Cir.1986), where the Tenth Circuit held that an employee's reasons for rejecting an employer's reinstatement offers were not sufficient to create an issue for the jury. 804 F.2d at 123. In *Giandonato*, the employee successfully argued that he was constructively discharged as a result of age discrimination. Similar to the case presented here, the employer in *Giandonato* argued that the employee should be precluded from receiving an award for back pay and lost wages compensation because the employee failed to mitigate his damages by rejecting several offers for reemployment.[17] *See id.* at 122.

The employee in *Giandonato* asserted three reasons for his rejection of the employer's offers of reinstatement. He indicated that "he did not want to work under [his

previous supervisor's] supervision, he had uncertainties about [the employer's] offers, and his wife was terminally ill with cancer." *Giandonato*, 804 F.2d at 122. Purportedly applying the special circumstances test articulated in *Ford*, the Tenth Circuit concluded that the employee's refusal to return to work for personal reasons, i.e., because his wife was ill and because he did not want to work under his previous supervisor, were not valid. *See id.* at 124. With regard to the employee's argument that he rejected the offers because they were uncertain, the Tenth Circuit observed that he failed to request any clarification of the offers from the employer. *See id.* at 125. The court also concluded that the record failed to establish that the offers "were anything other than bona fide unconditional offers of reinstatement." *Id.* Therefore, the Tenth Circuit held that the employee's rejection of the reinstatement offers "eliminated any viable claim he may otherwise have had for back pay and reinstatement." *Id.*

As noted in Part II, the facts of this case are clearly distinguishable from those of *Giandonato*. Unlike the employee in *Giandonato*, Fair addressed her uncertainties with Red Lion's reinstatement offer in two ways. First, Fair responded to Red Lion's initially vague offer by making specific requests with regard to the conditions of her reinstatement. In particular, Fair requested that "*all* her employee benefits must be restored without penalty for their interruption." (Emphasis added.). Second, after Red Lion failed in its second offer to adequately clarify the terms of the benefit package, Fair contacted Red Lion's insurance company directly to determine Red Lion's ability to bridge benefits. Thus, the majority's reliance on the Tenth Circuit's reasoning in *Giandonato* is misplaced because Fair

---

**17.** The Tenth Circuit noted that the employer made numerous written and verbal offers for reemployment. First, approximately one month after the employee filed his discrimination claim with the EEOC, the employer orally related to the EEOC investigator that the employee could "return to active employment on a probationary status for six months with no loss of service credit." *Giandonato*, 804 F.2d at 125. The verbal offer for reinstatement was reiterated one

week later in a letter to the EEOC investigator. *See id.* One month later, the employer made another verbal offer for reemployment during a meeting with the EEOC investigator and the employee. *See id.* The third offer was confirmed by a letter two days later. *See id.* The employer made its final offer for reinstatement one week later in another letter to the EEOC investigator. *See id.* The employee did not respond to any of these offers for reinstatement.

took affirmative steps to address the uncertainties of Red Lion's offers.[18]

My conclusion that the Tenth Circuit's reasoning is controlled by the specific facts of *Giandonato* finds support in *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198 (7th Cir. 1989). In *Graefenhain*, the Seventh Circuit explained that "[t]he accrual of damages ... is not terminated merely because the employee refuses an offer of reinstatement; instead, it is only 'an unreasonable refusal ... [which] will preclude recovery of front pay.'" 870 F.2d at 1203 (quoting *McNeil v. Economics Laboratory, Inc.*, 800 F.2d 111, 118 (7th Cir.1986)). Distinguishing its facts from those of *Giandonato*, the *Graefenhain* court stated that, "[o]nly after receiving an appropriately detailed offer is [a] discharged employee required either to accept the offer or to provide specific reasons why it is inadequate." *Graefenhain*, 870 F.2d at 1203. Thus, *Graefenhain* highlights the fact that *Giandonato* does not establish a *per se* rule requiring an employee to clarify ambiguous terms in an employer's offer of reinstatement. More importantly, however, the reasoning of *Giandonato* does not mandate the result reached by the majority in this case because the facts of the two cases are clearly distinguishable.

### IV.

In conclusion, the majority's decision fails to properly consider the facts, and the inferences to be drawn from those facts, in the light most favorable to Fair. Viewed in the proper light, I find that Fair presented sufficient evidence to satisfy her burden such that a reasonable juror could conclude that her rejection of Red Lion's offer of re-employment was reasonable. I also disagree with the majority's application of *Giandonato* to the specific facts of this case. Unlike the employee in *Giandonato*, Fair took affirmative steps to clarify the ambiguity in Red Lion's reinstatement offer concerning the medical benefits that would be provided upon her re-employment. Accordingly, I dissent.

18. In addition, the cases are distinguishable because the offers made by the employer in *Giandonato* became progressively more detailed and ultimately contained terms and conditions of employment superior to those that the employee

I am authorized to say that Justice HOBBS and Justice BENDER join in this dissent.

enjoyed before his constructive discharge. In contrast, both of Red Lion's offers of re-employment were arguably vague and failed to address Fair's specific requests for a desk position with "all benefits."