Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2018 CO 56**

**No. 16SC365, <u>U.S. Welding, Inc. v. Advanced Circuits, Inc.</u>—Breach of Contract—Mitigation—Settlement Offer—Accord and Satisfaction.**

U.S. Welding sought review of the court of appeals' judgment affirming the district court's order awarding it no damages whatsoever for breach of contract with Advanced Circuits. Notwithstanding its determination following a bench trial that Advanced breached its contract to purchase from Welding all its nitrogen requirements during a one-year term, the district court reasoned that by declining Advanced's request for an estimate of lost profits expected to result from Advanced's breach prior to expiration of the contract term, Welding failed to mitigate.

The supreme court reverses the judgment of the court of appeals concerning the failure to mitigate, and it remands the case for further proceedings, holding that the district court erred by requiring Welding to settle for a projection of anticipated lost profits, rather than its actual loss, as measured by the amount of nitrogen Advanced actually purchased from another vendor over the contract term, because an aggrieved party is not obligated to mitigate damages from a breach by giving up its rights under the contract.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

**2018 CO 56**

**Supreme Court Case No. 16SC365**
*Certiorari to Colorado Court of Appeals*
Court of Appeals Court Case Nos. 15CA190 & 15CA331

**Petitioner:**

United States Welding, Inc., a Colorado corporation,

v.

**Respondents:**

Advanced Circuits, Inc., a Colorado corporation; and Buckeye Welding Supply Company,

Inc., a Colorado corporation.

**Judgment Reversed**
*en banc*
June 18, 2018

**Attorneys for Petitioner:**
Arckey & Associates, LLC
Thomas J. Arckey
  *Centennial, Colorado*

**Attorneys for Respondent Advanced Circuits, Inc.:**
Laff Gordon Bennett Logan PC
John A. Logan
  *Denver, Colorado*

No appearance on behalf of Respondent Buckeye Welding Supply Company, Inc.

**JUSTICE COATS** delivered the Opinion of the Court.

¶1 U.S. Welding sought review of the court of appeals' judgment affirming the district court's order awarding it no damages whatsoever for breach of contract with Advanced Circuits. See Advanced Circuits, Inc. v. U.S. Welding, Inc., Nos. 15CA0190 & 15CA0331 (Colo. App. Mar. 24, 2016). Notwithstanding its determination following a bench trial that Advanced breached its contract to purchase from Welding all its nitrogen requirements during a one-year term, the district court reasoned that by declining Advanced's request for an estimate of lost profits expected to result from Advanced's breach prior to expiration of the contract term, Welding failed to mitigate.

¶2 Because an aggrieved party is not obligated to mitigate damages from a breach by giving up its rights under the contract, and because requiring Welding to settle for a projection of anticipated lost profits, rather than its actual loss, as measured by the amount of nitrogen Advanced actually purchased from another vendor over the contract term, would amount to nothing less than forcing Welding to relinquish its rights under the contract, the district court erred. The court of appeals' judgment concerning failure to mitigate is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

I.

¶3 On March 5, 2014, Advanced Circuits, Inc., filed a complaint alleging breach of contract and interference with contract against United States Welding, Inc. In response, Welding filed a cross-complaint for breach of contract against Advanced and a third-party complaint against Buckeye Welding Supply Company, Inc., the company with which Advanced replaced Welding as its nitrogen supplier. Following a two-day

bench trial in October 2014, the district court made findings and conclusions, and entered judgment.

¶4     The court found that on June 16, 2011, Welding and Advanced entered into a two-year contract for the sale of liquid nitrogen, whereby Advanced agreed to purchase all its required liquid nitrogen from Welding, without limitation on the mode by which the liquid nitrogen was to be delivered. For the initial two-year term of the contract, Welding delivered the liquid nitrogen to Advanced using individual cylinders—called "dewars"—according to the pricing scheme for delivery by dewar, the only pricing scheme specified in the contract.

¶5     Pursuant to its own terms, on June 16, 2013, the contract automatically renewed for an additional year. In late 2013, however, Advanced concluded that it would be cheaper to receive liquid nitrogen for its expanding needs in bulk rather than by dewar, and at its request, the parties attempted to negotiate a price for bulk delivery. After those negotiations proved unsuccessful, Advanced solicited bids from other liquid nitrogen suppliers for bulk delivery of the nitrogen. Advanced ultimately selected Buckeye as its new supplier and, on February 18, 2014, informed Welding that it was terminating their contract as of June 16, 2014—the end of the contract's term. Despite indicating that it was terminating at the end of the contract period, however, Advanced also advised Welding that it would be excused from future performance after February 28, 2014, and it requested that Welding calculate its anticipated lost profits to permit Advanced to "buy out" the remainder of the contract.

¶6 Welding responded by notifying Advanced that by refusing dewar delivery from it and, instead, accepting nitrogen from another vendor prior to expiration of the June 16, 2014 contract term, Advanced would be in breach of the contract. Notwithstanding the previous, failed negotiations regarding bulk delivery, Advanced again offered to accept bulk liquid nitrogen deliveries from Welding through the end of the contract term in lieu of immediately replacing Welding as its nitrogen supplier. Welding declined that offer, and on February 26, 2014, Advanced began receiving bulk-delivered liquid nitrogen from its new supplier, Buckeye. The district court found that prior to the end of the contract term, Buckeye delivered to Advanced the equivalent of 161 dewars of nitrogen.

¶7 Although the district court concluded that Advanced had breached its contract with Welding by allowing Buckeye to provide deliveries of liquid nitrogen between February and June of 2014, it nevertheless ruled that Welding was not entitled to recover any damages. It reasoned that by refusing to either (1) provide Advanced a requested lost profits analysis, or "buyout" amount, or (2) agree to bulk delivery for the remainder of the contract, Welding failed to take reasonable steps to mitigate its damages. The court of appeals affirmed as to the first point and did not reach the second.

¶8 United States Welding then petitioned this court for a writ of certiorari.

**II.**

¶9 Although it is well settled that a party aggrieved by a breach of contract must take reasonable steps to mitigate or minimize its damages, see, e.g., Fair v. Red Lion

4

<u>Inn</u>, 943 P.2d 431, 437 (Colo. 1997), it is a similarly well-settled principle of contract law that an aggrieved party cannot be required to accept offers from the breaching party if such offers are "conditioned on surrender by the injured party of his claim for breach," Restatement (Second) of Contracts § 350 cmt. e (Am. Law. Inst. 1981) (concerning damage mitigation).[1]  From this latter principle, it is widely accepted that the duty to mitigate does not oblige a party aggrieved by a breach of contract to accept an offer from the breaching party that would result in a relinquishment of the aggrieved party's rights under the original contract.  <u>See, e.g.</u>, <u>Publicker Chem. Corp. v. Belcher Oil Co.</u>, 792 F.2d 482, 488 (5th Cir. 1986) (quoting 5 A. Corbin, <u>Corbin on Contracts</u> § 1043 at 274 (2d ed. 1964)) ("One is not required to mitigate his losses by accepting an arrangement with the repudiator if that is made conditional on his surrender of his rights under the repudiated contract."); <u>Teradyne, Inc. v. Teledyne Indus., Inc.</u>, 676 F.2d 865, 870 (1st Cir. 1982) ("[T]here is no right to so-called mitigation of damages where the offer of a substitute contract is conditioned on surrender by the injured party of his claim for breach" because one "is not required to mitigate his losses by accepting an arrangement

---

[1] Notwithstanding the lack of any acknowledgement by either the district or intermediate appellate court, the contract at issue here is clearly a contract for the sale of goods, governed by the Uniform Commercial Code.  In the past, we have never found it necessary to definitively resolve the question whether accepted principles of contract interpretation concerning avoiding loss, or mitigating damages, apply equally to contracts governed by the Code, and in light of our determination that even if they do, they were erroneously applied here, we again find it unnecessary to do so.  <u>See</u> <u>Cherokee Inv. Co. v. Voiles</u>, 443 P.2d 727, 730 (Colo. 1968) (declining to decide whether a duty to mitigate existed in the UCC's predecessor statute); <u>cf.</u> <u>Prutch v. Ford Motor Co.</u>, 618 P.2d 657, 662 (Colo. 1980) (suggesting that there is an obligation imposed by the UCC on buyers to mitigate incidental and consequential damages caused by a seller's breach).

with the repudiator if that is made conditional on his surrender of his rights under the repudiated contract." (internal quotation marks omitted)); Stanspec Corp. v. Jelco, Inc., 464 F.2d 1184, 1187 (10th Cir. 1972) ("A non-defaulting party need not accept a modified contract in mitigation of its damages when the modified offer includes abandonment of any right of action for a prior breach as a condition of acceptance."); O'Dell v. Basabe, 810 P.2d 1082, 1102 (Idaho 1991) ("A plaintiff asserting wrongful discharge is not required to mitigate damages by accepting an alternative position which requires the employee to relinquish claims arising from the employer's breach."); cf. Pierce v. F.R. Tripler & Co., 955 F.2d 820, 826–27 (2d Cir. 1992) (holding evidence of a rejected settlement offer inadmissible to demonstrate a failure to mitigate, because such evidence is barred by plain language of FRE 408); Clevenger v. Bolingbrook Chevrolet, Inc., 401 F. Supp. 2d 878, 882 (N.D. Ill. 2005) (same).

¶10     In this jurisdiction, as elsewhere, both this court and the intermediate appellate court have recognized that it would simply be unreasonable and contrary to fundamental principles of contract law to mandate that a party aggrieved by a breach give up its rights under the contract to mitigate its damages. Despite holding, for example, that the duty to mitigate may, under certain circumstances, require a discharged employee to accept a former employer's unconditional offer of reinstatement, we made clear in Red Lion Inn that accepting reinstatement would not be required if doing so would constitute "a disadvantageous renegotiation of the original contract or an abandonment of rights and remedies thereunder." Red Lion Inn, 943 P.2d at 438–39 (emphasis added); see also Stone v. Satriana, 41 P.3d 705, 713 n.10

6

(Colo. 2002) (citing <u>Gunn Infiniti v. O'Byrne</u>, 996 S.W.2d 854, 855 (Tex. 1999)) (emphasizing that a "failure to settle can never amount to a failure to mitigate" because "inherent in settlement is a forfeiture of legal rights and such a forfeiture is not required."); <u>Westec Constr. Mgmt. Co. v. Postle Enters. I, Inc.</u>, 68 P.3d 529, 532 (Colo. App. 2002) ("[A] party need not accept, as mitigation, a modification offer that is conditioned on the abandonment of a right of action.").

¶11    A party to a contract may, of course, make an offer for an accord which, if accepted and satisfied, would absolve it of its obligations under the original contract. <u>See</u> Restatement (Second) of Contracts § 281 (Am. Law Inst. 1981); 29 Richard A. Lord, <u>Williston on Contracts</u> § 73:27 (4th ed. 2002).  Accord and satisfaction does not, however, implicate any requirement to avoid loss, or mitigate damages, but rather creates a new contract, capable through satisfaction of preventing a breach of the original contract.  In any event, in the absence of impossibility, frustration of purpose, or some other reason not involving the fault of any party, for which a contract is no longer capable of being fulfilled, the other party is never obligated to accept an offer of an accord.

## III.

¶12    In addition to basic errors of contract interpretation, the reasoning of both the district court and the intermediate appellate court, leading to their conclusion that despite Advanced's breach of their contract, Welding was not entitled to any damages, also suffers from a fundamental conceptual flaw concerning the obligation to mitigate damages.

7

¶13    Perhaps most straightforwardly, the conclusion of both courts—that by providing Advanced the requested projection of future losses, Welding would have been placed in the same position as if the contract had been fulfilled, and therefore would have been made whole and suffered no loss at all—was supported by neither fact nor law.  The district court simply concluded, without further explanation of its reasoning, that by soliciting a buyout figure prior to the expiration of the contractual period, Advanced effectively offered to make Welding "completely whole."  Given the evidence of purchases from Buckeye during the contract period, which was available and presented by the time of trial, should the district court have intended this proposition to be a factual finding that Welding's actual lost profits were no greater than its projections would have been, that finding was clearly erroneous.[2]

¶14    Perhaps realizing this difficulty, the court of appeals expressly held that the damages suffered by Welding as a result of the breach were not to be measured by the total amount of nitrogen purchased from another vendor but rather by the amount of nitrogen Advanced could have been expected to buy over the contract period, assuming it were forced to continue receiving its nitrogen in dewars.  In doing so, that court erred both as a matter of contract interpretation and general principles concerning the measure of damages for breach of contract.  In rejecting Advanced's assertion that the contract in this case merely required it to purchase from Welding its requirement for nitrogen as delivered by dewar, the court of appeals agreed with the express finding of

[2] The 161 dewar equivalent found by the district court to have been delivered by Buckeye far exceeded the 116 dewar estimate in Welding's pre-litigation calculation that had been based on Advanced's past requirement of liquid nitrogen.

8

the district court that the contract plainly required Advanced to satisfy all of its nitrogen requirements from Welding, regardless of the method of delivery. However, it then interpreted its own prior case law and the applicable provisions of the Restatement (Second) of Contracts to require that Welding's damages be measured not by its lost profits from actual nitrogen purchases from another vendor but rather by the expectations of the parties at the time of contracting concerning the amount of nitrogen that Advanced would be likely to purchase from Welding. Apart from being an untenable interpretation of the terms of the contract itself, this reasoning simply stands on their head accepted principles of contract damages and the applicable provisions of the Restatement.

¶15    While the Restatement does provide that an injured party has the right to damages based on his expectation interest, it could not be more clear in explaining that the expectation interest to which it refers is measured by the loss in the value to the injured party of the other party's actual performance that is caused by its failure or deficiency. The injured party's damages are not dependent upon the value to some hypothetical reasonable person or on some market, but rather on the net profit that party has lost as a result of the volume it has lost from the broken contract. See Restatement (Second) of Contracts § 347 cmt. f (Am. Law Inst. 1981); see also § 4-2-708, C.R.S. (2017) (setting forth seller's damages under Colorado's Uniform Commercial Code). The expectation of the parties as expressed in this contract, as with any exclusive requirements contract, see, e.g., § 4-2-306, C.R.S. (2017) (defining requirements contracts under the UCC), was that Welding would be bound to provide, at the

9

specified price, all of the nitrogen required by Advanced during the specified period, and that Advanced would in turn be bound to purchase all its nitrogen needs from Welding, according to those terms. There was no suggestion here that through no fault of the parties these expectations were unattainable or that the damages in question could not be calculated from the amounts actually involved. The conclusion that by requesting a buyout figure prior to expiration of the contract period Advanced effectively offered to make Welding whole was therefore demonstrably erroneous.

¶16 With regard to the central question posed by the mitigation rationale of both courts—whether accepting Advanced's offer would have amounted to relinquishing Welding's rights under the original contract—the court of appeals, in a single sentence, conclusorily dismissed the objection as unpreserved and declined to address it. This excuse of the appellate court was at least suspect as a matter of record but was clearly unjustified as a matter of law. Whether Welding referred the district court to the specific controlling law or not, it clearly argued throughout that it could not be required to mitigate its damages by settling for a projection of its future losses and, by the express terms of the contract, that it was entitled to damages measured by Advanced's actual requirements over the full contract period. In addition, however, as a matter of law, failure to mitigate is an affirmative defense, which must be both pled and proved by the defendant. See CJI-Civ. 2d 5:2.

¶17 While we have previously noted that mitigation will "generally" turn on questions of fact, Red Lion Inn, 943 P.2d at 437, the question whether taking particular steps to avoid damages would entail the relinquishment of contractual rights is clearly a

10

matter of contract interpretation, and therefore a matter of law.  <u>See</u> <u>Ad Two, Inc. v.</u> <u>City and Cty. of Denver ex rel. Manager of Aviation</u>, 9 P.3d 373, 376 (Colo. 2000) ("[C]ontract interpretation is a question of law that is reviewed de novo.").  Because the relinquishment of a party's rights under the original contract is never a reasonable step that a non-breaching party has a duty to take in order to mitigate damages, the question of relinquishment cannot be separated from the duty of mitigation itself.  Proof that the non-breaching party to a contract has failed to take reasonable steps to mitigate his damages resulting from the breach, therefore, necessarily includes a determination that the steps at issue did not require the relinquishment of his rights under the contract. Because the exclusive requirements contract at issue here, as found by the district court and as expressly affirmed by the court of appeals, facially entitled Welding to profits from the sale of any liquid nitrogen purchased by Advanced during the contract period, requiring Welding to anticipate its losses prior to the expiration of the contract period, and settle for that amount, could not amount to a reasonable step to mitigate its damages.

¶18    Even if the court of appeals were correct concerning the measure of damages, and even if Welding could have been expected to accurately predict Advanced's production decisions based on the delivery of liquid nitrogen solely by dewar, analyzing Welding's obligation to accept a buyout offer by Advanced in terms of mitigation, as both lower courts did, would nevertheless have been conceptually unjustified.  It is undisputed, as a factual matter, that Advanced did not offer Welding an option to limit its damages without foregoing its rights under the contract.  By

11

offering to accept a <u>buyout</u> figure from Welding, Advanced offered an accord, which would replace the original contract with a second and, upon satisfaction of that accord, absolve Advanced of any obligation to comply with the original contract. <u>See</u> Restatement (Second) of Contracts § 281 (Am. Law Inst. 1981). There has been no suggestion here of impossibility, frustration of purpose, or any other justification for a requirement to modify, or restructure, the original contract. <u>See</u> Restatement (Second) of Contracts ch. 11 (Am. Law Inst. 1981). Advanced simply sought to be released from its obligations under the contract because it could satisfy its requirement for liquid nitrogen more cheaply from another vendor. While accord and satisfaction may have been an acceptable means of resolving the contract dispute short of a breach, Welding labored under no obligation to accept Advanced's offer in lieu of its contractual rights.

¶19    The fact that Welding had no obligation to accept an accord as a means of avoiding a portion of the damage it would suffer from a breach does not suggest, of course, that it had no duty to mitigate damages at all. Quite the contrary, had Welding been able to reasonably avoid any lost volume of sales as the result of Advanced's breach, it would have been obligated to do so. If it were the case that Welding had access only to a finite supply of liquid nitrogen, then it would have been obliged to make reasonable efforts to secure a replacement buyer for the liquid nitrogen that it would have otherwise supplied to Advanced. There is no indication in the record, however, that Welding was limited by a finite supply of liquid nitrogen, precluding it from making additional sales without in any way minimizing its loss. <u>See</u> Restatement (Second) of Contracts § 350 cmt. d (Am. Law Inst. 1981) ("The mere fact that an injured

12

party can make arrangements for the disposition of the goods or services that he was to supply under the contract does not necessarily mean that by doing so he will avoid loss. If he would have entered into both transactions but for the breach, he has 'lost volume' as a result of the breach . . . . In that case the second transaction is not a 'substitute' for the first one."); see also Bitterroot Intern. Sys., Ltd. v. W. Star Trucks, Inc., 153 P.3d 627, 639–41 (Mont. 2007) (adopting the "lost volume seller" theory described in the Restatement and explaining that injured party must prove that it possessed the capacity to make additional sales, which would have been profitable, and that it probably would have made additional sales absent the buyer's breach); Wired Music, Inc. v. Clark, 168 N.E.2d 736, 738–39 (Ill. App. Ct. 1960) (concluding that a distributor of music by telephone wires with an unlimited supply of music could recover lost profits for the remaining months under a contract from a customer who discontinued service before the end of the contract term). In the absence of any allegation that Welding failed to minimize its lost profits by finding alternate purchasers for all of its available supply, we need not address the specific requirements for demonstrating a failure to mitigate damages from the breach of an exclusive requirements contract.

¶20    Finally, a failure to mitigate is an affirmative defense only with regard to damages that could have been reasonably avoided, and the effect of that defense is to bar recovery from the breaching party of damages that need never have been suffered, notwithstanding its breach. By conceptualizing Welding's failure to accept Advanced's offer of an accord as a failure to mitigate, and then denying Welding recovery of even the damages admittedly caused by Advanced and for which it was purportedly willing

13

to compensate Welding, the lower court judgment reflects more a penalty for not accepting Advanced's offer of settlement prior to litigation than a reduction in recovery for damages that need not have been suffered. While an aggrieved party's failure to recover in excess of a rejected settlement offer meeting statutory requirements may be penalized by the imposition of costs and fees, see § 13-17-202, C.R.S. (2017), even failing to recover in excess of a settlement offer, much less simply rejecting one, could not justify depriving the aggrieved party of any recovery at all.

¶21 The freedom of contract has been staunchly defended in this jurisdiction throughout its existence. Principles of contract construction and damages for breach have developed over centuries and, in the absence of legislation to the contrary, cannot be ignored by courts of law, regardless of the relative insignificance of the amounts involved or the unwillingness of the parties to accede to less costly and burdensome means of resolving their disputes. Solomonic as any particular judicial resolution of a contract dispute may appear, unless it comports with established law, it cannot be sustained.

## IV.

¶22 Because an aggrieved party is not obligated to mitigate damages from a breach by giving up its rights under a contract, and because requiring Welding to settle for a future projection of lost profits rather than its actual loss, as measured by the amount of nitrogen Advanced actually purchased from another vendor over the contract term, would amount to nothing less than forcing Welding to relinquish its rights under the contract, the district court erred. The court of appeals' judgment concerning failure to

14

mitigate is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.[3]

---

[3] Because we reverse the judgment concerning failure to mitigate, the question whether Welding's failure to mitigate deprived it of prevailing party status for purposes of attorney fees, a question as to which we also granted certiorari, is no longer a live issue.